FILED
2008 Jul-28  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **FABIAN FERNANDO RIOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. CV-06-S-1728-M** |
| | ) | |
| **CHARLES E. WATTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Fabian Fernando Rios, asserts claims against his former employer, Charles E. Watts, Inc., pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000 *et seq.,* for a racially hostile work environment, constructive discharge based upon his race and national origin, and supplemental state law claims for negligent supervision and negligent retention.[1] The case currently is before the court on defendant's motion for summary judgment.[2] Upon consideration of the motion for summary judgment, the briefs, and the parties' evidentiary submissions, the court concludes the motion should be denied.

## I.  STANDARD OF REVIEW

---

[1]Doc. no. 1 (Complaint).  Plaintiff dismissed his claim for constructive discharge. Doc. no. 52 (plaintiff's brief), at 20 ("Plaintiff dismisses Count Two of his Complaint stating the claim of Constructive Discharge.").

[2]Doc. no. 43.

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal

---

[3] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

Defendant, Charles E. Watts, Inc.,[4] is a paving contractor in Gadsden, Alabama. Defendant performs work on a seasonal basis, because asphalt cannot be laid in very cold weather.  Consequently, defendant lays off its employees for approximately ninety days each winter, and then hires them back in the spring.[5]

Plaintiff, Fabian Fernando Rios, an individual of Mexican heritage,[6] first worked for defendant from June of 1988 to the winter of 1992.[7]  He returned to work for defendant in March of 2001, as a dump-truck driver.[8]  In that position, plaintiff enjoyed the use of one of defendant's newer dump trucks.[9]

Upon plaintiff's return to work in 2001, he received a copy of the company's employee handbook.[10]  The handbook contained a copy of the company's Equal

---

[4]Charles E. Watts, the individual, is the president and EEO officer of Charles E. Watts, Inc.  To distinguish between the individual and the company, the court will refer to Charles E. Watts, the individual, as "Mr. Watts," or simply "Watts," and will refer to Charles E. Watts, Inc. as "the company" or "defendant."

[5]Defendant's evidentiary submission, Tab A (Deposition of Fabian Rios), at 12.

[6]*Id.* at 6.

[7]*Id.* at 10-11.

[8]*Id.* at 12, 28-29.

[9]*Id.* at 32.

[10]Rios Deposition, at 29-30; defendant's evidentiary submission, at document labeled Bates Stamp No. 000047 (acknowledgment of receipt of employee handbook, signed by plaintiff and dated March 2001).

Opportunity Policy, which states:

> It is the policy of Charles E. Watts, Inc. to assure that applicants are employed, and that employees are treated during employment, without regard to their race, religion, sex, color or national origin. Such action shall include: Employment upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship, preapprenticeship, and/or on the job training.

> I, Charles E. Watts Jr., shall remain the Equal Employment Opportunity Officer and shall carry out the duties of administering and promoting a program of equal employment opportunity with authority and responsibility to do so. All members of our staff who are authorized to hire, supervise, promote and discharge employees, or who recommend such action, or who are substantially involved in such action, will be made fully cognizant of, and will implement, the equal employment opportunity policy and contractual responsibilities of this company.

> Charles E. Watts, Inc. will use our best efforts to utilize minority group subcontractors or subcontractors with meaningful minority group representation among their employees. We shall use our best efforts to assure subcontractor compliance with their equal employment opportunity obligations. Charles E. Watts, Inc. will keep such records as are necessary to determine compliance with our equal employment opportunity obligations.[11]

The handbook also contained a copy of the company's Anti-Harassment Policy,

which states, in pertinent part:

> Charles E. Watts, Inc. is committed to maintaining a work environment that is free from all forms of discrimination. In keeping with this commitment, the company will not tolerate the harassment of Charles E. Watts, Inc. employees or applicants (male or female) by

---

[11]Defendant's evidentiary submission, at document bearing Bates Stamp No. 000025.

4

anyone, including any supervisor, co-worker, or nonemployee.

Harassment consists of unwelcome conduct, whether verbal or physical, that is based upon a person's sex, color, *race*, religion, *national origin*, age, disability, or other protected group status. Charles E. Watts, Inc. will not tolerate harassing conduct that affects an individual's employment, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment.

. . . .

It is every employee's responsibility to help maintain a work environment free from harassment. Employees who believe they have experienced or observed harassment should report their complaint or concern immediately *to their supervisor*, or the designated EEO Officer, Charles E. Watts, Jr., at 547-2554.

Each complaint will be investigated. Although a complete investigation requires the collection of all relevant information, every effort will be made to conduct the investigation as confidentially as possible, with disclosure made only where there is need to know. If an investigation confirms that harassment has occurred, Charles E. Watts, Inc. will take prompt corrective action.[12]

In 2002, plaintiff received a promotion to the position of tanker driver, which also resulted in an increase in pay.[13] At that time, the company employed a total of four tanker drivers, and plaintiff had the least seniority among the four. Consequently, when a particular job did not require the use of four tanker trucks,

---

[12]*Id.* at documents labeled Bates Stamp Nos. 000041-000042 (emphasis supplied). The portions of the policy not quoted here relate specifically to *sexual* harassment.

[13]Rios Deposition, at 36.

5

plaintiff would drive a dump truck instead.[14]  Mr. Watts testified that every employee was at times required to perform secondary duties.  For example, other tanker drivers might sometimes have to drive a dump truck, perform traffic control functions, or run an asphalt distributor.[15]

Plaintiff continued working for defendant until mid-December of 2004, when he was laid off at the end of the season.[16]  The company invited plaintiff to return to work in March of 2005, but he declined.[17]  On March 31, 2005, plaintiff filed a Charge of Discrimination ("charge") with the Equal Employment Opportunity Commission ("EEOC").  The charge stated:

> I started to work for [the company] in March 2001.  My position was that of a dump truck driver.  I started a Tanker job in August 2002.  Because of my national origin, I have been treated differently.
>
> There are three more tanker drivers.  They are allowed light duty work such as sit in a van or pick-up, stop signs, watching traffic on dead end country roads whereas I am made to constantly drive the dump truck all day.  Some employees are allowed to stop for biscuits, however, they dock some of us 15 to 30 minutes for stopping.  Some employees are allotted a cash bonus.  I was not afforded a bonus.  Mr. Charlie Watts yelled and cussed me because I pulled over to have a mechanic check my rear tire while the three White tanker drivers rested under an overpass reading the paper.  He does not cuss the other three White

---

[14]*Id.* at 37.

[15]Defendant's evidentiary submission, Tab B (Deposition of Charles Watts, Jr.), at 45-48.

[16]Rios Deposition, at 39.

[17]*Id.* at 41.

tanker drivers.  I have been forced to work long hours (drive all night and drive all day), haul overweight loads, and not keep a log book.  I am the only Hispanic that drives two trucks and services both.  A new paving process called Armor Coating started up.  The employer took my tanker truck and put another employee on it, because he stated I could not do it, even though I had two and one half years seniority.  My truck leaked for years, but nothing was done to fix it.  The other tanker drivers got their trucks repaired if anything was wrong.  I have been subjected to racial slurs from mostly the Whites, including Allen Woodall, supervisor, including being called a "tomato picker."

I believe that I have been discriminated against because of my national origin, Hispanic, which is a violation of Title VII of the Civil Rights Act of 1964, as amended.[18]

Plaintiff indicated on the charge form that the earliest act of discrimination occurred on March 30, 2001, and the latest act occurred on December 13, 2004.[19]

Plaintiff elaborated in his deposition on the allegedly discriminatory treatment he endured.  He testified that several of defendant's employees — including Allen Woodall, his immediate supervisor — called him names including "wetback," "tomato picker," "god damn Mexican," "Julio Foolio," "fucking burrito eater," "taco," "foreigner," "tortilla head," "tomato head," "good-for-nothing Mexican," "fucking Mexican," and "my guacamole friend."[20]  Woodall also asked plaintiff how long it took him to cross the river, and made comments about Mexican people eating

---

[18]Defendant's evidentiary submission, at document labeled Bates Stamp No. 000003.

[19]*Id.*

[20]Rios Deposition, at 42-55.

7

dogs.[21]  Plaintiff could not provide specific dates on which he heard these comments, but he testified that they began sometime in the summer of 2002, and they occurred "sporadically," "weekly sometimes," or "through the years" during 2002-2004.[22]  He also agreed that the name-calling continued throughout his employment with defendant.[23]  Anthony Cambron, who worked with plaintiff from 2001 to 2002, stated that plaintiff was exposed to racially derogatory comments "on a regular basis," or "at least once a week most every week."[24]  Greg Honea, a white tanker driver who worked with plaintiff from 2001 to the end of 2004, stated that co-workers "commonly" called plaintiff names, including "Taco," "Julio," "tomato picker," "wetback," and "pinchy hoto."[25]  Plaintiff repeatedly asked his co-workers and supervisor to stop calling him names.  Each time he did, they would "calm down for maybe a day or so," but then they would begin again.[26]  Plaintiff reported this conduct to Allen Woodall on more than one, but less than ten, occasions, but he never

---

[21]*Id.* at 57.

[22]*Id.* at 42-58, 73.  Greg Honea also testified that plaintiff was called similar names by other workers, but Honea also could not identify any dates on which the name-calling occurred.  Defendant's evidentiary submission, Tab D (Deposition of Greg Honea), at 42-57.

[23]Rios Deposition, at 75.

[24]Plaintiff's evidentiary submission, Exhibit 2 (Declaration of Anthony Cambron), at ¶ 10.

[25]Plaintiff's evidentiary submission, Exhibit 1 (Declaration of Greg Honea), at ¶ 6.  Honea stated that the term "pinchy hoto" translates to "fucking queer."  *Id.*

[26]Rios Deposition, at 52-53.

8

discussed it with Mr. Watts.[27]  Woodall told plaintiff he would look into the situation, but there is no evidence of any remedial action being taken.[28]

Plaintiff also testified that Mr. Watts "cussed" him, "threw fits" when dealing with him, and yelled and screamed at him.  On one occasion, in either September or October of 2004, Mr. Watts jumped on plaintiff's truck at a job site, called plaintiff a "fucking Mexican," and told plaintiff he was the only Mexican at the company.  Mr. Watts said plaintiff was stealing from him, and told plaintiff that, if he didn't like what was being said, he could either quit or get paid by the load.[29]  Plaintiff understood Mr. Watts' comment about stealing to mean that he thought plaintiff was stealing time from him by wasting time during the work day.[30]  However, plaintiff testified that other, white employees were allowed to sit and read a newspaper during work hours when they should have been driving their trucks.[31]  Greg Honea testified that he had gone fishing, read newspapers, and taken a nap during work hours.[32]

Plaintiff also testified that the other, white tanker drivers received a cash bonus

---

[27]*Id.* at 54-55,61-63.

[28]*Id.* at 61-63.

[29]*Id.* at 64.

[30]*Id.* at 68-72.

[31]*Id.* at 81-82.

[32]Honea Deposition, at 33-35.

at Christmas, but he did not receive one.[33]  According to plaintiff, Mr. Watts placed

cash in a white envelope, handed it to the other drivers, and said "I got you a little

something extra in here."[34]  Greg Honea testified that he regularly received cash

bonuses in amounts ranging from $300 to $600 at the end of the year.  Mr. Watts

would discreetly pull him aside, hand him cash in a white envelope, and say

something like "this is between me and you."[35]  This cash bonus was in addition to

a year-end bonus check Honea received each year.[36]

The EEOC issued a dismissal of plaintiff's charge and notice of his right to sue

on July 3, 2006.[37]  Plaintiff filed this lawsuit on August 31, 2006.[38]

## III.  DISCUSSION

**A.    Timeliness of Plaintiff's Hostile Work Environment Claim**

Defendant first argues that plaintiff's hostile work environment claim is time-

barred.

---

[33]*See* plaintiff's evidentiary submission, Exhibit 1 (Declaration of Greg Honea), at ¶ 9 ("Mr. Watts never paid Mr. Rios a cash bonus during the time we were employed together.").

[34]Rios Deposition, at 82-85.  Plaintiff did receive a bonus *check* at the end of each work season, but the issue he is complaining of here is other employees' receipt of a cash bonus *in addition to* the regular bonus check.  *Id.* at 86.

[35]Honea Deposition, at 62-64.  *See also* Honea Declaration, at ¶ 9.

[36]Honea Deposition, at 64.

[37]Defendant's evidentiary submission, at document labeled Bates Stamp No. 000001.

[38]*See* Complaint.

Plaintiff brought the hostile work environment claim pursuant to both Title VII and § 1981.  His complaint clearly invokes both statutes:

> This is a suit authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended (Title VII), *and* pursuant to 42 U.S.C. § 1981.  The jurisdiction of this court is invoked to secure protection and redress deprivation of rights secured by Title VII *and* § 1981, together with pendent state claims.[39]

The fact that plaintiff omitted § 1981 from the caption to Count One of his complaint is not dispositive.  *See Alexander v. Vesta Ins. Group, Inc.,* 147 F. Supp. 2d 1223, 1233 n.12 (N.D. Ala. 2001).  Therefore, the court must consider whether plaintiff filed suit within the time limitations established by both Title VII and § 1981.

### 1.    Title VII

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII.  Foremost among these is the requirement that a charge of discrimination be submitted to the EEOC within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."); *Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1387 (11th Cir. 1982) ("In order to assert a claim

---

[39]Complaint, at ¶ 1 (emphasis supplied).

of racial discrimination under Title VII, a claimant must file a complaint with the EEOC within 180 days after the alleged discriminatory practice occurred."). A hostile work environment claim based upon racial or sexual harassment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). For that reason, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [180 day] time period." *Id*. at 122.

Plaintiff's EEOC charge was filed on March 31, 2005. Therefore, his claim will be considered timely as long as one act constituting part of the allegedly hostile work environment occurred on or after October 2, 2004 (180 days before March 31, 2005). Defendant argues that plaintiff has no evidence of any harassing acts that occurred during the limitations period, because he could not provide any specific dates on which he was subjected to racial slurs and name-calling at work. Despite plaintiff's inability to identify specific dates, however, he did testify that the comments occurred "sporadically," "weekly," and "through the years" of 2002-2004, and he agreed that the name-calling occurred *throughout* his employment with defendant. Greg Honea also testified that co-workers "commonly" called plaintiff

12

names between 2001 and the end of 2004.[40]  This testimony, construed in the light most favorable to plaintiff, indicates that the harassing behavior plaintiff endured was continual and ongoing, and that it lasted through the end of his employment with defendant in December of 2004.  Plaintiff's inability to point to a specific date on which he was called names is immaterial when the name-calling occurred with such regular frequency.  Further, plaintiff testified that Mr. Watts called him a "fucking Mexican" in either September or October of 2004.  Construing that testimony in the light most favorable to plaintiff, the court concludes that at least part of the harassing behavior plaintiff endured occurred within the limitations period.  Therefore, plaintiff's Title VII claim is not time-barred.[41]

## 2.    Section 1981

Section 1981 does not contain the same administrative prerequisites as Title

---

[40]Plaintiff also relies upon the testimony of Anthony Cambron that plaintiff was exposed to racially derogatory comments "on a regular basis" or "at least once a week most every week."  *See* Cambron Declaration, at ¶ 10.  However, as defendant points out, Cambron only worked with plaintiff from 2001 to 2002.  His testimony cannot be used to prove that plaintiff endured race-based comments in the workplace after October of 2004.

[41]Plaintiff refers to incidents other than name-calling — including denial of bonuses, denial of ceratin positions, being required to work while other employees rested, and being forced to risk his license by driving excessive hours — to support a hostile work environment.  Some of those events occurred prior to October 2, 2004, and they may or may not be sufficiently related to the name-calling that occurred during the limitations period to justify their inclusion as evidence of a hostile work environment.  The court passes no judgment on that issue at this time.  The proper method for determining whether discrete events (other than name-calling) that occurred before October 2, 2004 can be considered is the filing of a motion in limine prior to trial.  This opinion simply addresses whether plaintiff's claims should be dismissed as untimely.  They should not.

13

VII.   Therefore, the limitations period for a § 1981 claim runs to the filing of a judicial complaint, not to the filing of an EEOC charge.  *See Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 460 (1975).

The court concludes that the general, four-year, "catch-all" statute of limitations for federal statutory claims set forth in 28 U.S.C § 1658 applies to plaintiff's race-based harassment claim under § 1981.  Section 1658 states that, "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted *after* the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."  28 U.S.C § 1658 (emphasis supplied).  Section 1658 was enacted in 1990.  *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 371 (2004).  Section 1981 was amended in 1991 to protect an individual's rights with regard to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See id.* at 373; 42 U.S.C. § 1981(b).  Prior to the 1991 amendment, § 1981 did not protect against race-based harassment in the workplace.  After the 1991 amendment, § 1981 *does* protect against race-based harassment.  *Jones,* 541 U.S. at 372-73; *see also Patterson v. McLean Credit Union,* 491 U.S. 164 (1989).  The Supreme Court has held that, because a hostile work environment claim "[does] not allege a violation of the pre-1990 version of § 1981

14

but [does] allege violations of the amended statute, [such a claim] 'ar[ises] under' the amendment to § 1981 contained in the 1991 Act." *Jones,* 541 U.S. at 383.[42]

Plaintiff's complaint in this action was filed on August 31, 2006. Therefore, if any of the harassing behavior occurred after August 31, 2002, then the entire hostile work environment claim will be timely. *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002) ("An allegation [pursuant to § 1981] that an employer has allowed a racially hostile work environment to prosper . . . should be reviewed in its entirety if any part of this allegation falls within the statute of limitations period."). As discussed above, plaintiff has identified harassing behavior that occurred after August 31, 2002. Accordingly, his § 1981 hostile work environment claim is not time-barred.

**B.    Scope of Plaintiff's EEOC Charge**

Defendant also argues that plaintiff's hostile work environment claim should

---

[42]The parties fail to address 28 U.S.C. § 1658 or *Jones* in their briefs. Instead, plaintiff states that "[t]he statute of limitations for 42 U.S.C. § 1981 is two years." Doc. no. 52 (plaintiff's brief), at 12 (citing *Robinson v. Regions Fin. Corp.,* 242 F. Supp. 2d 1070 (M.D. Ala. 2003)). That *was* the rule prior to the 1991 amendments to § 1981. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660-61 (1987) (instructing district courts considering § 1981 claims to "select the most appropriate or analogous state statute of limitations" from the state in which the allegedly discriminatory act occurred"); *Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (holding that § 1981 intentional discrimination claims arising out of acts occurring in Alabama are governed by Alabama Code § 6-2-38(l) (1975), the state's general, two-year limitations period applicable to personal injury actions). It also remains the rule with regard to § 1981 claims that were not made possible by the 1991 amendments to the statute. *Jones,* 541 U.S. at 383.

be dismissed because his EEOC charge did not contain allegations of a hostile work environment.  "In light of the purpose of the EEOC exhaustion requirement," the Eleventh Circuit has held "that a 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (citing *Alexander v. Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000); *Sanchez v. Standard Brands,* 431 F.2d 455, 460-61 (5th Cir. 1970)).[43]  "Courts are nonetheless 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII].'"  *Gregory,* 355 F.3d at 1280 (quoting *Sanchez*, 431 F.2d at 460-61) (bracketed alteration in original).  Thus, "the scope of an [administrative complaint] should not be strictly interpreted."  *Gregory,* 355 F.3d at 1280-81 (internal quotations omitted).  Subsequent judicial claims will be allowed "if they 'amplify, clarify, or more clearly focus' the allegations in the administrative complaint, but . . . allegations of new acts of discrimination are inappropriate."  *Id.* at 1279-80 (citing *Wu v. Thomas,* 863 F.2d 1543, 1547 (11th Cir. 1989)).

Plaintiff's EEOC charge contained allegations that he was required to work

---

[43]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

while other employees goofed off, that he did not receive a cash bonus, that Mr. Watts "yelled and cussed" at him, that he was required to work longer hours than regulations allow, and that his truck was not repaired. He claims that all of these differences in treatment were because of his Hispanic national origin. Even more to the point, the charge states, "I have been subjected to racial slurs from mostly the Whites, including Allen Woodall, supervisor, including being called a 'tomato picker.'" These are the very same allegations upon which plaintiff relies to support his hostile work environment claim before this court. It is true that, in this lawsuit, plaintiff has offered evidence of being called names other than "tomato picker," but that additional evidence is only an "amplification," "clarification," or "focusing" of the allegations in his charge. It is not evidence to support "allegations of new acts of discrimination." *See Gregory,* 355 F.3d at 1279-80.

Simply stated, the hostile work environment claim in plaintiff's complaint, and the evidence he has offered to support it, are clear extensions of the allegations of discrimination in his EEOC charge. Accordingly, his hostile work environment claim will not be barred on the ground that it was not encompassed by his EEOC charge.

## C.   Merits of Plaintiff's Hostile Work Environment Claim

Defendant also argues that plaintiff does not have sufficient evidence to support his hostile work environment claim on the merits. Plaintiff must provide

proof of five elements to establish a racially-hostile work-environment claim:  *i.e.*, (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his race, color, or national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment and create a discriminatory abusive working environment; and (5) his employer is liable for the environment under a theory of either direct or vicarious liability.  *See, e.g., Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002); *Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).[44]

Defendant challenges only the fourth element, *i.e.,* that the harassment was sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment and create a discriminatory abusive working environment.[45]  This element embodies both an objective and a subjective component.  In other words, plaintiff must show *both* that he subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993).

It is unquestionable that plaintiff *subjectively* perceived his working

---

[44]These elements are the same under both Title VII & § 1981.  *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)

[45]Doc. no. 44 (defendant's brief), at 15 ("Of the elements required to establish a hostile work environment claim, Rios can not prove that the alleged harassment was severe enough to alter the conditions of his employment environment so as to create an 'abusive working environment.'").

environment to be hostile and abusive.  Evaluating the *objective* severity of the offensive conduct requires the court to examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  However, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment and created a working environment that a reasonable person would find discriminatorily abusive.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

The evidence reveals that plaintiff endured explicit derogatory comments from his supervisor and co-workers on a regular basis throughout his employment with defendant.  The comments could be considered to be humiliating, given that plaintiff was the only Hispanic employee, and that the comments were uttered in the presence of other, non-Hispanic employees.  Considering the totality of the evidence, a

reasonable jury could conclude that plaintiff suffered a severe or pervasive hostile working environment that a reasonable person would find discriminatorily abusive.[46] Accordingly, the court will not grant summary judgment on the merits of plaintiff's hostile work environment claim.

**D.      State Law Claims**

Plaintiff's state law claims are for negligent supervision and negligent retention.  To support these claims, plaintiff must show that defendant "had actual knowledge of [its employees'] harassment and did nothing about it (for negligent retention) or would have known about the harassment had it exercised due and proper diligence (for negligent . . . supervision)."  *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1309 (11th Cir. 2007).  Defendant argues that plaintiff cannot succeed on these claims because Mr. Watts, the president of the company and its designated EEO officer, had no knowledge of any harassment.  This argument fails on two main levels.  First, Mr. Watts' lack of knowledge about other employees' harassing behavior loses significance in light of the fact that Mr. Watts himself is one of the alleged harassers.  Further, it is irrelevant whether Mr. Watts knew about the other employees' alleged harassment, because it is undisputed that plaintiff reported

---

[46]Defendant inexplicably fails to address the racially derogatory comments made by plaintiff's supervisor and co-workers as conduct to support a hostile work environment, despite the fact that plaintiff makes these comments the primary focus of his claim.

the harassment to Allen Woodall, his immediate supervisor.  Reporting harassing conduct to a supervisor is all that is required by defendant's policy; the offended employee is not required to discuss the situation directly with Mr. Watts.  Defendant does not dispute that no action was taken to correct the harassing behavior after plaintiff complained to Woodall.  Accordingly, summary judgment will not be granted on plaintiff's claims for negligent supervision and negligent retention.

## IV.  CONCLUSION

Based on all of the foregoing, defendant's motion for summary judgment will be denied.  An appropriate order will be entered contemporaneously herewith.

DONE this 28th day of July, 2008.

_____
United States District Judge